**IN THE UNITED STATES DISTRICT COURT
<u>FOR THE DISTRICT OF MARYLAND</u>**
*Southern Division*

|  |  |  |
|---|---|---|
|  | * |  |
| **JOHN AND KIMBERLY BEAHN,** *et al.*, |  |  |
|  | * |  |
| **Plaintiffs,** |  |  |
| **v.** | * | **Case No.: GJH-20-2239** |
|  |  |  |
| **TRAVIS GAYLES,** *et al.*, | * |  |
|  |  |  |
| **Defendants.** | * |  |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**MEMORANDUM OPINION**</u>

Plaintiffs John and Kimberly Beahn, Clara I. Obermeier, Miriam Roth, James and Gem Lawson, Joshua and Penny Bortnick, and Christopher and Meagan Rizzo—individually and as parents and next friends of their minor children—as well as Brookewood School, Inc. and Avalon School, Inc. bring this civil action against Defendants Montgomery County, Maryland (the "County"), Dr. Travis Gayles, and Marc Elrich, asserting a claim for Declaratory Judgment and, pursuant to 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments to the Constitution stemming from now-rescinded directives preventing private and religious schools in Montgomery County from having in-person instruction due to the COVID-19 pandemic. ECF No. 1. Pending before the Court are Motions to Dismiss filed by Defendants County and Elrich, ECF Nos. 14 & 16, and by Defendant Gayles, ECF No. 15. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the following reasons, Defendants' Motions to Dismiss are granted.

I.      **BACKGROUND**[1]

   **A. Governor Hogan's Executive Orders**

   Following an influx of COVID-19 cases in the United States, on March 5, 2020,

Governor Hogan declared a State of Emergency in Maryland under Md. Code Ann., Pub. Safety

§ 14-303, allowing the issuance of "reasonable orders, rules and regulations" designed to

"protect life and property or calculated effectively to terminate or control the public emergency."

ECF No. 11 ¶¶ 24–25. He also proclaimed a catastrophic health emergency under PS § 14-3A-

02, which authorizes the governor to "order individuals to remain indoors or refrain from

congregating" if "necessary and reasonable to save lives or prevent exposure to a deadly agent."

*Id.* The Governor also issued a series of executive orders on gatherings and other precautions. *Id*.

¶ 26.

   One of the executive orders issued by the Governor, Executive Order 20-04-05-02,

delegated authority to local health officers to regulate "Unsafe Facilities." *Id*. ¶ 91. Executive

Order 20-04-05-02, issued on April 5, 2020, authorized local health officers to close "an Unsafe

Facility," defined as one "unable or unwilling to operate in a manner that does not pose an

unreasonable risk of exacerbating the spread of COVID-19 (including, without limitation, as a

result of non-compliance with Social Distancing Guidance)." *Id*.; *see also* ECF No. 3-7 at 2.[2]

The health officer could "require the Unsafe Facility to modify its operations to comply with

Social Distancing Guidelines" or "designate all or part of the Unsafe Facility as a zone in which

the occupancy and use of buildings may be controlled, and prohibit or limit the movement of

---

[1] Unless stated otherwise, all facts are taken from Plaintiffs' Amended Complaint or documents attached to and relied upon in the Amended Complaint and are accepted as true. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

[2] Pins cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

individuals and/or vehicles into, in, or from the Unsafe Facility." ECF No. 11 ¶ 92; ECF No. 3-7 at 2.

Local or county health officers are state employees jointly appointed by the County and Secretary of Health for the State of Maryland, ECF No. 11 ¶ 81, and subject to the administrative and financial control of the Secretary of Health, *id*. ¶ 83, and they "act at the discretion of the Secretary of Health to enforce the State health laws and policies, rules, and regulations, adopted by the Secretary of Health," *id*. ¶ 40. They also enforce the "'rules and regulations' of the County health boards," which, in Montgomery County, are issued by the County Council. *Id*. ¶¶ 40–41.

### B. Montgomery County Schools

Authority over Montgomery County schools, public and private, rests with the state. *Id*. ¶ 38. Thus, although Montgomery County public schools are governed by a County Superintendent and Board of Education, the state's General Assembly possesses the "exclusive authority to regulate public and private schools and has designated that authority to the Maryland State Board of Education." *Id*. ¶¶ 38–39. Additionally, the State Department of Education conducts regulatory oversight over the county's nonpublic schools. *Id*. ¶ 38.

According to the Amended Complaint, there are 22,312 students enrolled in 180 private schools in Montgomery County. *Id*. ¶¶ 14–15. Of those students, there are 9,345 enrolled in religious schools, accounting for approximately 40 percent of total private school enrollment. *Id*. A corresponding 40 percent of Montgomery County's nonpublic schools are religious. *Id*. ¶ 15. By contrast, the Montgomery County public school system is one of the largest in the country, educating 126,680 students and employing 23,347 staff members. *Id*. ¶ 150.

### C. Maryland and Montgomery County School Closures

On March 16, 2020, soon after COVID-19 hit the United States and Governor Hogan issued the State of Emergency, Montgomery County Public Schools Superintendent, Dr. Jack R. Smith, suspended in-person classes for public schools. *Id*. ¶ 54. Then, on May 6, 2020, the State Superintendent of Schools, Dr. Karen Salmon, closed public schools across the state for the rest of the school year. *Id*. ¶ 55. The State Department of Education encouraged—but did not require—private schools to close, leaving the decision to the discretion of each school's Legal Authority. *Id*. ¶ 56. None of the Governor's executive orders prior to August 1 explicitly referenced schools except for one that mentioned "self-defense schools;" instead, guidance and decisions concerning schools generally came from the State Superintendent. *Id*. ¶ 27.

In May 2020, R.J. Hawley, the director of two of the Plaintiff schools, contacted the Montgomery County Department of Health and Human Services regarding fall reopening plans for private schools. *Id*. ¶ 33. According to the Amended Complaint, Kenny Welch, a department representative, responded:

> Thank you for contacting the Montgomery County Department of Health and Human Services regarding guidance for private schools. At this point, Montgomery County does not exactly know if local government will play a role if schools will be able to operate. It will depend on if the Governor and the Maryland Department of Education give power to the local authorities and what the status is regarding case load and potential surge of the virus moving into the fall.

*Id*.

In June 2020, the State Superintendent issued Maryland's Recovery Plan, which "detail[ed] extensive options and best practices" for school reopenings. *Id*. ¶ 58; *see also* ECF No. 1-4. The Plan gave public schools discretion over whether, when, and how to reopen but required face coverings and other preventative measures. ECF No. 11 ¶¶ 62–64. The Plan also stated that nonpublic schools' decisions regarding reopening "will continue to be made by the

school's Legal Authority." *Id.* ¶¶ 31, 59. Finally, the Plan requested that public school systems submit reopening plans for the fall by August 14, 2020, and "emphasized the importance of CDC guidelines and adherence to state health protocols." *Id.* ¶¶ 66–67; *see also* ECF No. 1-4 at 8–9; ECF No. 1-5 at 2. On July 15, 2020, the State Superintendent's office reaffirmed that private schools continued to retain the authority to decide whether to open. ECF No. 11 ¶ 61.

### 1. Public School Closure

Based on a parent survey and stakeholder input favoring in-person learning, on July 14, 2020, the Montgomery County Public Schools Superintendent, Dr. Jack Smith, issued a draft reopening plan for public schools that included a variety of precautions. *Id.* ¶¶ 68–69. On July 17, 2020, the teachers' union issued a statement denouncing the draft plan as "inadequate to protect the health and safety of students and staff." *Id.* ¶ 71. On July 21, 2020, Montgomery County retracted the draft plan and announced that, based on advice from Dr. Travis Gayles, the County Health Officer, public schools would be virtual-only for the first semester. *Id.* ¶ 72. The announcement stated, "Working with Dr. Gayles and county elected officials, we will reassess at the end of the first quarter (November 9, 2020) to determine if we are able to implement a phased blended model in the second semester (beginning February 1, 2021)." *MCPS To Provide Virtual-Only Learning for First Semester*, MONTGOMERY COUNTY PUBLIC SCHOOLS (July 21, 2020), https://www.montgomeryschoolsmd.org/departments/publicinfo/community/school-year-2020-2021/community-update-20200721.html.[3] The Montgomery County Board of Education

---

[3] The Court takes judicial notice of this announcement, as it was integral to and explicitly relied on and quoted in the Amended Complaint. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). Additionally, judicial notice of this and other Montgomery County Public School announcements cited here is appropriate because they were made publicly available by the school district, a government entity. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record."); *Daniels–Hall v. National Education Association*, 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of information on the websites of two school districts); *see also J.T. v. de Blasio*, 500 F. Supp. 3d 137, 149 (S.D.N.Y. 2020).

met about the plan on August 6. ECF No. 11 ¶ 78.[4] During the August 6 Board meeting,
"Superintendent Smith stated that 'if things change dramatically' in the early fall as to COVID-
19 transmission rates and cases in the County, then the public school system 'might be able to
accelerate' physical reopening of the schools." *Id.* ¶ 79.

      As a result of the County's decision to provide virtual-only learning in public schools,
some Montgomery County parents decided to place their children in private schools, which were
planning to be open for in-person instruction in the fall. *Id.* ¶¶ 74, 105. Over the summer, private
schools had engaged in extensive retrofitting and reorganization of schools to enable social
distancing and other preventative measures. *Id.* ¶¶ 105, 137. These efforts, taken at "considerable
expense," included reducing classroom size; installing plexiglass between desks in classrooms
and other facilities; investing in tenting to "utilize outdoor space"; introducing mandatory
temperature readings; expanding the number of school entrances; increasing cleaning and
handwashing; requiring masks; changing class schedules to limit hallway use, or, in some cases,
eliminating hallway use entirely by using exits from classrooms directly to the outdoors; and
limiting lunch group sizes. *Id.* ¶¶ 138–39. Meanwhile, "some Montgomery County parents and
interest groups began to raise 'equity' concerns about public school students having to learn
remotely, while religious and private schools were conducting in-person classes." *Id.* ¶ 77.

### 2. July 31 Directive

      On Wednesday, July 29, 2020, Montgomery County convened a webinar with private
school leaders to discuss current COVID-19 trends and how they could impact when and how

---

[4] Although the Amended Complaint correctly states that the Board did not vote to ratify the plan, *see* ECF No. 11 ¶
78, the Board did vote to approve a virtual-only reopening for the 2020-2021 school year, *Board of Education
Approves Virtual-Only Return to School for First Semester*, MONTGOMERY COUNTY PUBLIC SCHOOLS (Aug. 7,
2020),
https://ww2.montgomeryschoolsmd.org/press/index.aspx?pagetype=showrelease&id=10468&tyty=archive&startYe
ar=2020&pageNumber=20&mode=.

private schools would choose to reopen. *Id*. ¶ 96. According to the Amended Complaint, Dr.

Gayles "said he could not offer the schools guidance about reopening" and "made it clear that he

was not familiar with the extraordinary retrofitting, revamping and rescheduling that religious

and private schools ha[d] undertaken to reopen safely." *Id*. ¶¶ 97–98.

Then, two days later, at 7:58 pm on July 31, 2020, Dr. Gayles issued "Health Officer

Directive and Order Regarding Private and Independent Schools" (the "July 31 Directive"). *Id*. ¶

16; ECF No. 1-2. The July 31 Directive, issued "[p]ursuant to State Executive Order 20-07-29-

01," stated that, due to increases in COVID-19 transmission rates in the region and CDC

guidance, "[n]onpublic schools located within Montgomery County, Maryland are prohibited

from physically reopening for in-person instruction through October 1, 2020." ECF No. 1-2.

State Executive Order 20-07-29-01, issued on July 29, 2020, had relaxed some COVID-19

restrictions on businesses but stated that "[a]ll businesses, organizations, establishments, and

facilities in Maryland shall comply with . . . orders issued by the applicable Local Health Officer

pursuant to the Order of the Governor of the State of Maryland Number 20-04-05-02, dated April

5, 2020, entitled 'Delegating Authority to Local Officials to Control and Close Unsafe

Facilities.'" ECF No. 1-3 at 8–9. Executive Order 20-07-29-01 further provided:

> If a political subdivision determines that doing so is necessary and reasonable to save
> lives or prevent exposure to Covid-19, the political subdivision is hereby authorized to
> issue orders that are more restrictive than this Order ("Local Orders"):
>
> > i. requiring any businesses, organizations, establishments, or
> > facilities to close and/or modify their operations; and
> >
> > ii. requiring individuals to remain indoors or to refrain from
> > congregating.

7

*Id.* at 3. According to the Amended Complaint, "political subdivision" references "the county executive and county council acting together," not the Local Health Officer. ECF No. 11 ¶¶ 44, 90.

The day after Dr. Gayles issued the July 31 Directive, Governor Hogan issued a statement rebuking it, stating that he "strongly disagree[s] with Montgomery County's decision to mandate the closure of private and parochial schools." *Id.* ¶ 174. Then, on Monday, August 3, 2020, Governor Hogan issued Executive Order 20-08-03-01, which amended the prior Executive Order to exclude schools from the entities to which the "political subdivision" could attach "more restrictive closing orders." *Id.* ¶ 46. While the Order did not explicitly overturn the July 31 Directive or state that Dr. Gayles had lacked the authority to issue it when he did, the Order stated, "The blanket closure mandate imposed by Montgomery County was overly broad and inconsistent with the powers intended to be delegated to the county health officer." *Id.*

Plaintiffs filed suit on August 3, 2020. ECF No. 1.

### 3. August 5 Directive

On the afternoon of August 5, Dr. Gayles and County Executive Marc Elrich answered questions from the press and were repeatedly asked about whether the July 31 Directive had been rescinded in light of Executive Order 20-08-03-01. ECF No. 11 ¶ 47. Dr. Gayles responded, "As it currently stands, it has not been rescinded," but also said he was "continuing to evaluate the impact of the Governor's executive order on the directive that we put out." *Id.* "Just hours later," the County rescinded the July 31 Directive and issued a new one in its place (the "August 5 Directive"). *Id.* ¶ 48. The August 5 Directive was similar to the prior version, although it excluded "programs licensed or regulated by the Maryland Office of Childcare" from the definition of nonpublic schools. *Id.* Importantly, rather than claim authority under a state

8

executive order as the July 31 Directive did, the August 5 Directive stated that Dr. Gayles acted "pursuant to Maryland Code Annotated Health General § 18-208 and COMAR 10.06.01.06." *Id.* ¶ 49. Section 18-208 requires local health officers to "cooperate" with the State Secretary of Health "to prevent the spread of disease." *Id.* ¶ 87. COMAR 10.06.01.06 allows the Secretary of Health or local health officers to "take any action or measure necessary to prevent the spread of communicable disease," including "order[ing the] cessation of operation of a business or facility determined or suspected to be a threat to public health." *Id.* ¶ 88.

However, on the morning of August 6, 2020, State Secretary of Health Robert Neall issued a memorandum with the subject line "Blanket Closure of Non-Public Schools in Local Jurisdictions" that stated, "It is the health policy of the State of Maryland that non-public schools not be closed in a blanket manner." *Id.* ¶ 52. Instead, local health officers were to "carefully evaluate the facts and circumstances of each individual school and their proposed COVID-19 response plan." *Id.* The memorandum further maintained that all schools, public and private, should have an "individualized opportunity" to construct plans to reopen safely in compliance with federal and state COVID-19 guidance. *Id.*

In light of the Secretary's memorandum, Dr. Gayles rescinded the August 5 Directive on August 7, 2020. ECF No. 14-1 at 4.

### D.        Procedural History

As stated above, Plaintiffs filed suit against Defendants on August 3, 2020. ECF No. 1. Plaintiffs originally sought emergency relief by filing a Motion for Temporary, Preliminary, and Permanent Injunctive Relief on August 4, 2020, ECF No. 3, which this Court later denied as moot as a result of the August 5 Directive having been rescinded and private and religious

schools having been allowed to open for in-person instruction, ECF No. 21. On August 7, 2020, Plaintiffs filed an Amended Complaint. ECF No. 11.

On October 16, 2020, Defendants Elrich and Montgomery County filed a Motion to Dismiss. ECF Nos. 14 & 16.[5] Defendant Gayles filed a Motion to Dismiss the same day. ECF No. 15. Plaintiffs responded in opposition to both motions on November 13, 2020. ECF No. 19; ECF No. 20. Defendants did not file replies.

## II.    STANDARD OF REVIEW

Defendants argue the Court should dismiss this action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). "A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019). To overcome a Rule 12(b)(6) motion, a complaint must allege sufficient facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating the sufficiency of the plaintiff's claims, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in original) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). However, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement[.]" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th

---

[5] ECF No. 14 and ECF No. 16 appear to be identical documents.

10

Cir. 2009). Accordingly, in ruling on a motion brought under Rule 12(b)(6), a court "separat[es] the legal conclusions from the factual allegations, assum[es] the truth of only the factual allegations, and then determin[es] whether those allegations allow the court to reasonably infer that 'the defendant is liable for the misconduct alleged.'" *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012) (quoting *Iqbal*, 556 U.S. at 1949–50).

Defendants also move to dismiss Plaintiffs' requests for declaratory and injunctive relief for mootness. ECF No. 14 at 6–7; ECF No. 15 at 8–9. Because mootness "constitutes a part of the constitutional limits of federal court jurisdiction," *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (quoting *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)), questions of mootness are properly considered pursuant to Federal Rule of Civil Procedure 12(b)(1) as challenges to the court's subject matter jurisdiction, *see Nat'l Fed'n of the Blind v. United States Dep't of Educ.*, 407 F. Supp. 3d 524, 529 (D. Md. 2019). A motion pursuant to Rule 12(b)(1) should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). "[W]hen a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004).

## III.    DISCUSSION

### A. Declaratory and Injunctive Relief Claims

In Count I of their Amended Complaint, Plaintiffs bring a claim for Declaratory Judgment asking the Court to declare that Dr. Gayles did not have the authority to prohibit private and religious schools from reopening in-person, and seeking related injunctive relief. Plaintiffs also seek declaratory and injunctive relief as part of their constitutional claims. Defendants argue that Plaintiffs' requests for declaratory and injunctive relief are now moot in light of Dr. Gayles' retraction of the August 5 Directive. Indeed, when "an intervening circumstance . . . at any point during litigation" eliminates the case or controversy required by Article III, "the action can no longer proceed and must be dismissed as moot." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160–61 (2016) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)); *see also Barr v. Galvin*, 626 F.3d 99, 104 (1st Cir. 2010) (noting a federal court "lack[s] constitutional authority to decide moot questions"); *Redfern v. Napolitano*, 727 F.3d 77, 83 (1st Cir. 2013) ("[T]he fact that a live controversy existed when the plaintiff brought suit is not enough."). A court ordinarily must determine if a case is moot before proceeding to the merits. *Am. C.L. Union of Mass. v. U.S. Conf. of Cath. Bishops* ("*ACLUM*"), 705 F.3d 44, 52 (1st Cir. 2013). The party invoking mootness bears the burden of proving it. *Id.*

Here, Plaintiffs originally sought declaratory and injunctive relief based on the Directives issued by Dr. Gayles preventing private and religious schools from meeting in-person, claiming *inter alia*, that Dr. Gayles had exceeded his authority. *See* ECF No. 3. Dr. Gayles rescinded the Directives, allowing the schools to meet in-person, which would appear to moot those aspects of Plaintiffs' Amended Complaint. However, Plaintiffs argue that two exceptions to the mootness

doctrine apply here: (1) voluntary cessation and (2) "capable of repetition yet evading review." The Court will address them in turn, ultimately concluding that neither applies.

### 1. Voluntary Cessation

An exception to the mootness doctrine arises where the defendant voluntarily ceases the challenged practice. *See ACLUM*, 705 F.3d at 54. This "voluntary cessation" exception derives from "the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)). "[T]he exception seeks to prevent 'a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after.'" *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) (quoting *ACLUM*, 705 F.3d at 54–55). Nonetheless, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued," and such a defendant "'bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

When, as here, it is a governmental authority that changes its policy, there is a presumption that it acts in good faith under the voluntary cessation exception. *See Am. Cargo Transp., Inc. v. United States,* 625 F.3d 1176, 1180 (9th Cir. 2010) *(*"The government's change of policy presents a special circumstance in the world of mootness."). Additionally, "a voluntary change in official stance or behavior moots an action only when it is 'absolutely clear' to the court, considering the 'procedural safeguards' insulating the new state of affairs from arbitrary

reversal and the government's rationale for its changed practice(s), that the activity complained of will not reoccur." *Fikre v. FBI*, 904 F.3d 1033, 1039 (9th Cir. 2018).

Here, Defendant Gayles twice tried to impose a policy closing nonpublic schools for in-person instruction and was twice rebuked by state officials—first the Governor and then the state Secretary of Health. Defendant Gayles does not appear to dispute that, as a result of Governor Hogan's Executive Order and Secretary Neall's memorandum, he no longer has authority to close all private and religious schools in the County. *See Van Story v. Wash. Cty. Health Dep't*, No. ELH-17-3590, 2019 WL 3340656, at *10 (D. Md. July 25, 2019) (finding county health officers bound by the Secretary's directions), *aff'd sub nom.*, 830 F. App'x 725 (4th Cir. 2020). This conclusion is supported by the fact that, even as case counts in Montgomery County soared in November 2020, Defendant Gayles "strongly encourage[d]" all schools in the county to consider virtual instruction but did not mandate such a change. *See* Letter from Thomas Gayles, Health Officer and Chief for Montgomery County, to School Leadership (Nov. 19, 2020), https://www.montgomerycountymd.gov/covid19/Resources/Files/reopening/schools-letter-201119.pdf. In sum, Defendant Gayles rescinded the Directives due to Governor Hogan's Executive Order and Secretary Neall's memorandum, and not merely to avoid litigation, and there is no reasonable expectation that he will seek to reinstate them.

Reinstation of the policy is all the more unlikely given the improved circumstances regarding COVID-19 since this case was filed. While the Court is all too aware of the danger of pronouncing the COVID-19 pandemic "over" prematurely, and is cognizant of the risk posed by variants and vaccine-hesitancy,[6] with vaccines widely available, the dire conditions that

---

[6] *See, e.g.*, Rob Stein, *Fauci Warns Dangerous Delta Variant Is The Greatest Threat To U.S. COVID Efforts*, NPR (June 22, 2021), https://www.npr.org/sections/health-shots/2021/06/22/1008859705/delta-variant-coronavirus-

precipitated Defendant Gayles' decision to close schools are not currently expected to return.

Accordingly, given the circumstances under which Defendant Gayles rescinded the challenged

directives, and the changed conditions with respect to the COVID-19 pandemic, Defendants have

met their burden of showing it is "absolutely clear" that there is no reasonable expectation that

Defendant Gayles will reinstate a blanket closure of nonpublic schools, and the voluntary

cessation exception to the mootness doctrine does not apply. *Already*, 568 U.S. at 91 (quoting

*Friends of the Earth*, 528 U.S. at 190).

### 2. Capable of Repetition Yet Evading Review

A second, similar, exception to the mootness doctrine "applies where (1) the challenged

action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there

is a reasonable expectation that the same complaining party will be subject to the same action

again." *Fed. Election Comm'n v. Wisc. Right To Life, Inc.*, 551 U.S. 449, 462 (2007) (quoting

*Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). "The 'capable of repetition yet evading review'

exception is a narrow one, reserved for 'exceptional' circumstances." *Int'l Bhd. of Teamsters,*

*Loc. Union No. 639 v. Airgas, Inc.*, 885 F.3d 230, 237 (4th Cir. 2018). "[A] party seeking to

invoke this exception to the mootness doctrine bears the burden of showing its application."

*Williams v. Ozmint*, 716 F.3d 801, 810 (4th Cir. 2013); *see also ACLUM*, 705 F.3d at 57 (finding

that the party invoking the exception "bears the burden and must show a reasonable expectation

or demonstrated probability, . . . that it will again be subjected to the alleged illegality" (cleaned

up)). For the reasons stated above, Plaintiffs have not shown they will be subject to the same

---

unvaccinated-u-s-covid-surge; *SARS-CoV-2 Variant Classifications and Definitions*, CDC (July 20, 2021),
https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-info.html.

action again. Accordingly, the narrow "capable of repetition yet evading review" exception does not apply.

Plaintiffs' claims for declaratory and injunctive relief are therefore moot. Count I of the Amended Complaint is dismissed. The Court next turns to Plaintiffs' remaining claims for damages pursuant to 42 U.S.C. § 1983.

## B. Constitutional Claims[7]

42 U.S.C. § 1983 imposes civil liability on a person who, under color of state law, deprives any citizen of the United States or other person under the jurisdiction thereof of any right secured by the Constitution or laws of the United States. In this respect, § 1983 "is not an independent source of substantive rights, but simply a vehicle for vindicating preexisting constitutional and statutory rights." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 393–94 (1989)). "[T]o state a legally cognizable claim under Section 1983, Plaintiffs 'must establish three elements: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law.'" *Schiffbauer v. Schmidt*, 95 F. Supp. 3d 846, 851 (D. Md. 2015) (quoting *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997)).[8] Plaintiffs here claim that they were deprived of their rights

---

[7] Plaintiffs bring claims against Defendants directly under both the First and Fourteenth Amendments to the Constitution (Counts II–V) and under § 1983 (Counts VI–VII). However, § 1983 provides the exclusive remedy for the constitutional violations that Plaintiff alleges, and thus Plaintiffs do not have a cause of action directly under the Constitution. *See, e.g.*, *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992); *Thomas v. Shipka*, 818 F.2d 496, 502 (6th Cir. 1987), *vacated & remanded on other grounds*, 488 U.S. 1036 (1989); *Chase v. City of Portsmouth*, No. 2:05CV446, 2005 WL 3079065, at *9–10 (E.D. Va. Nov. 16, 2005); *Ocean Acres Ltd. P'ship v. Dare Cty. Bd. of Health*, 514 F. Supp. 1117, 1123 (E.D.N.C. 1981), *aff'd*, 707 F.2d 103 (4th Cir. 1983). Therefore, Counts II–V are dismissed, and the Court will proceed to analyze Plaintiffs' constitutional claims arising under § 1983.

[8] Although Plaintiffs sued Travis Gayles in his official capacity, in their Opposition, Plaintiffs withdraw this claim. ECF No. 19-1 at 23. Indeed, because he is a state employee, he may not be sued in his official capacity under § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66–69 (1989). However, Montgomery County, as a local municipality, and Marc Elrich, in his official capacity as an agent of Montgomery County, are considered "persons" under § 1983. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–95 (1978).

under the First and Fourteenth Amendments. Because, as discussed in detail below, the Court

finds the Directives did not deprive Plaintiffs of their rights under the First and Fourteenth

Amendments, Plaintiff has failed to sufficiently allege § 1983 claims against Defendants.[9]

### 1.  First Amendment: Free Exercise

The Free Exercise Clause of the First Amendment, which is made applicable to the states

through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting

the free exercise" of religion. U.S. Const. amend. I. While the Free Exercise Clause commands

that the government may not pass laws that stifle religious belief or practice, *see Church of the

Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993), it does not require the

government "to exempt religious practices from a 'valid and neutral law of general

applicability,'" *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 99 (4th Cir. 2013) (quoting *Emp't Div.,

Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990)). And, relevant to this case, "[t]he right

to practice religion freely does not include liberty to expose the community . . . to communicable

disease or . . . ill health or death." *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944).

If a law is not neutral or generally applicable, it "must be justified by a compelling

governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S.

at 531–32. However, if it is neutral and generally applicable, it need only survive rational basis

review. *See Jesus Christ Is the Answer Ministries, Inc. v. Balt. Cty.*, 915 F.3d 256, 265 (4th Cir.

2019), *as amended* (Feb. 25, 2019).

---

[9] Defendant Gayles raises the defense of qualified immunity. "Government officials are entitled to the defense of qualified immunity unless a § 1983 claims satisfies the following two-prong test '(1) the allegations underlying the clam, if true, substantiate a violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known." *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013) (citing *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006)). Courts addressing a qualified immunity defense can begin its analysis on either prong since both need to be met. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because the Court concludes that Plaintiffs' rights were not violated, the Court will not address whether the alleged violation was of an established right.

"A law is considered neutral if it proscribes conduct without regard to whether that conduct is religiously motivated or not." *Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 357 (4th Cir. 1998). Alternatively, a law is not neutral if it targets conduct because of its religious motivation, which may be shown through a lack of facial neutrality, evidence about the purpose of the law, or the effect of the law in operation. *Lukumi*, 508 U.S. at 534–35. As to general applicability, "[a]ll laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Id.* at 542. The government cannot only impose burdens on "conduct with a religious motivation." *Id.* at 543. This might be shown when the law is underinclusive, such that it fails to prohibit secular conduct that also endangers the interests the law is meant to promote. *Id.* "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531.

The July 31 and August 5 Directives ("the Directives") closing all private schools were neutral and generally applicable, as they applied to all private schools, both religious and non-religious. *See Commonwealth v. Beshear*, 981 F.3d 505, 509 (6th Cir. 2020) (finding order neutral and generally applicable where it "applies to all public and private elementary and secondary schools in the Commonwealth, religious or otherwise"). Plaintiffs argue that "[i]n targeting only religious and private schools, while entirely ignoring public schools, Defendants' order was so under inclusive such that it is effectively regulated religious conduct." ECF No. 19-1 at 29. But public schools had already been closed for the fall semester, ECF No. 14-1 at 2, and thus were subject to greater restrictions than private schools in the county, *see Agudath Israel of Am. v. Cuomo*, 979 F.3d 177, 180 (2d Cir. 2020) ("[T]he order subjects religious services to

restrictions that are similar to or, indeed, *less severe than* those imposed on comparable secular gatherings.").[10]

Moreover, Plaintiffs have not identified with particularity any other "comparable secular facilities" that have been treated more favorably. In evaluating comparators to determine whether a rule was underinclusive, "courts only 'compare the prohibited religious conduct with <u>analogous</u> secular conduct[.]'" *Cross Culture Christian Ctr. v. Newsom*, 445 F. Supp. 3d 758, 770 (E.D. Cal. 2020), *appeal dismissed*, No. 20-15977, 2020 WL 4813748 (9th Cir. May 29, 2020) (quoting *Gish v. Newsom*, No. EDCV 20-755-JGB(KKx), 2020 WL 1979970, at *6 (C.D. Cal. Apr. 23, 2020)) (finding in-person religious services "much more akin to" attending movies, restaurants, concerts, and sporting events than gathering at commercial and transportation locations). Here, private religious schools have an obvious secular counterpart—private non-religious schools—and they were treated identically.[11] *See Beshear*, 981 F.3d at 509; *see also Bishop of Charleston v. Adams*, No. CV 2:21-1093-BHH, 2021 WL 1890612, at *4 (D.S.C. May 11, 2021) (finding free exercise claim unlikely to succeed where the contested provision "discriminates along the private/public divide, not the religious/non-religious divide" and contrasting the provision with one that "discriminated against religious schools but not other private schools"). Accordingly, Plaintiffs have failed to allege that the Directives were underinclusive of similar, but secular, conduct.

---

[10] Moreover, to the extent Plaintiffs argue public schools were treated more favorably because the public-school Superintendent retained the authority to decide whether to reopen, that argument fails for the reasons discussed *infra* in Section III.B.4.

[11] Throughout the Amended Complaint and their briefing, Plaintiffs lump "religious and private" schools together as if they all then retain religious attributes. They do not. According to Plaintiffs' Amended Complaint, only 40 percent of private schools are religious, meaning that the majority of the schools impacted by the Directives were secular. ECF No. 11 ¶ 14–15.

Finally, there are no indications that the Directives were veiled attempts to target religious schools or that they were gerrymandered to regulate religious schools while appearing facially neutral. *See Beshear*, 981 F.3d at 510. To the contrary, Plaintiffs admit in their Complaint that religious schools represent a minority of the private schools in Montgomery County, ECF No. 11 ¶ 14–15; thus, if the Directives were targeting religious schools, they were drastically overinclusive. Moreover, as in *Commonwealth v. Beshear*, "[t]he contours of the order at issue here also in no way correlate to religion, and cannot be plausibly read to contain even a hint of hostility towards religion." 981 F.3d at 509. Thus, the Court concludes that the Directives were neutral and generally applicable. *Resurrection Sch. v. Gordon*, 507 F. Supp. 3d 897, 901 (W.D. Mich. 2020) (quoting *Beshear*, 981 F.3d at 509).

The Directives are therefore subject to rational basis review. *See Jesus Christ Is the Answer Ministries, Inc.*, 915 F.3d at 265.[12] "Under rational basis review, a classification enjoys a strong presumption of validity and is constitutional as long as 'there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *United States v. Timms*, 664 F.3d 436, 447 (4th Cir. 2012) (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993)). Additionally, "rational basis review imposes no affirmative evidentiary burden on the State; 'rational speculation unsupported by evidence or empirical data' suffices." *Just Puppies, Inc. v. Frosh*, 457 F. Supp. 3d 497, 518 (D. Md. 2020) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). "Under this deferential standard, the plaintiff bears the burden 'to

---

[12] Courts can evaluate the rationality of a statute on a motion to dismiss. *See HSH, Inc. v. City of El Cajon*, 44 F. Supp. 3d 996, 1008 (S.D. Cal. 2014) ("The rational basis test may be applied on a motion to dismiss." (citing *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1208–11 (9th Cir. 2005))). It is a plaintiff's burden to plead facts that demonstrate no conceivable government purpose could have provided a rational basis for the law. *See Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) ("[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it[.]" (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973))).

negate every conceivable basis which might support' the legislation." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364 (1973)); *see also Trump v. Hawaii*, — U.S. —, 138 S. Ct. 2392, 2420 (2018) ("[T]he Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny. On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973))); *Heller*, 509 U.S. at 319 ("[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" (quoting *Beach Commc'ns*, 508 U.S. at 313)).

Plaintiffs concede that "the County has a compelling interest in combatting the spread of COVID-19 and protecting the health of its citizens," ECF No. 20-1 at 31, and thus it is clearly a legitimate one as well. *Cf. Day v. Johnston*, No. 4:20-CV-10151-JLK, 2020 WL 7711681, at *3 (S.D. Fla. Dec. 29, 2020) ("If 'stemming the spread of COVID–19 is unquestionably a compelling [government] interest' as the Supreme Court has held, it is most certainly a substantial government interest as well." (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, ——— U.S. ———, 141 S. Ct. 63, 67 (2020))). Plaintiffs also do not allege facts suggesting that the policy lacked a rational basis; indeed, as the Directives were issued in response to rising COVID-19 infection rates and based on CDC guidance regarding reopening schools, *see* ECF No. 1-1 at 1, the Court finds that the school closure policy was rationally related to the County's interest in combatting the spread of COVID-19. *See Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 234 (D. Md. 2020), *appeal dismissed*, No. 20-1579, 2020 WL 6787532 (4th Cir. July 6, 2020) ("[I]t is clear that the prohibition on large gatherings is rationally related to the legitimate government interest of reducing the spread of COVID-19, because the prohibition

limits contact between individuals, which is how the virus spreads."); *Forbes v. Cty. of San Diego*, No. 20-CV-00998-BAS-JLB, 2021 WL 843175, at *5 (S.D. Cal. Mar. 4, 2021) ("Plaintiff's first claim does not plausibly plead that the Mask Rules lack any rational basis. His contentions disputing the scientific basis for the Mask Rules are simply not enough to state a plausible clam that the rules are not rationally related to a legitimate government interest."); *Williams v. Trump*, 495 F. Supp. 3d 673, 683 (N.D. Ill. 2020) (finding stay-at-home order "was supported by a rational basis—slowing the spread of COVID-19 in Illinois—and did not violate the Free Exercise Clause"). Plaintiffs' free exercise claim is thus dismissed.

## 2. First Amendment: Freedom of Assembly

In addition to religious exercise, the First Amendment protects the "right of the people peaceably to assemble." U.S. Const. amend. I. The Supreme Court has explained that, "[f]rom the [nation's] outset, the right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment rights with which it was deliberately linked by the draftsmen." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980); *see also De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) ("The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."). Thus, as with many freedom-of-speech cases, the Supreme Court has applied a time, place, and manner test to governmental restrictions in freedom-of-assembly cases. *See, e.g.*, *Richmond Newspapers*, 448 U.S. at 578; *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941). [13]

---

[13] Several courts have instead considered freedom of assembly claims under a freedom of association framework and analyzed them jointly as both parties here appear to do. *See, e.g.*, *Peterson v. Kunkel*, 492 F. Supp. 3d 1183, 1198 (D.N.M. 2020) ("Both 'the Supreme Court and the Tenth Circuit have conflated and rephrased associational and assembly rights as the "freedom to expressive association."'" (quoting *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1051 (D.N.M. 2020))); *Givens v. Newsom*, 459 F. Supp. 3d 1302, 1314 (E.D. Cal.), appeal dismissed, 830 F. App'x 560 (9th Cir. 2020); *see also Best Supplement Guide, LLC v. Newsom*, No. 220CV00965JAMCKD, 2020 WL 2615022, at *4 (E.D. Cal. May 22, 2020) ("Today, the freedom of association and freedom of assembly are largely viewed as one."); *Belle Garden Est., LLC v. Northam*, No. 7:21CV00135, 2021 WL 1156855, at *3 (W.D. Va. Mar. 26, 2021) (noting that the freedom of assembly is "more commonly known as freedom of association"); Timothy

Under that test, content-based time, place, and manner restrictions are normally subject to strict scrutiny, while content-neutral regulations are instead subject to intermediate scrutiny. *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989); *Richmond Newspapers*, 448 U.S. at 578; *Ross v. Early*, 746 F.3d 546, 552 (4th Cir. 2014). "'[C]ontent-neutral' speech restrictions [are] those that 'are justified without reference to the content of the regulated speech.'" *Boos v. Barry*, 485 U.S. 312, 320 (1988) (quoting *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976)) (emphasis omitted). "The government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791.

To survive intermediate scrutiny, the content-neutral regulation must be "narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Id.* (alteration in original) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 (1984)). "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation'" and does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 799 (second alteration in original) (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)); *see also Blasecki v. City of Durham*, 456 F.2d 87, 91 (4th Cir. 1972) ("[W]henever the state restricts the right of assembly . . . the state must have a compelling interest in the subject

---

Zick, *Recovering the Assembly Clause*, 91 Tᴇx. L. Rᴇv. 375, 377 (2012) ("[T]he freedom of assembly was transformed into a right of association.") (citing John D. Inazu, *Liberty's Refuge: The Forgotten Freedom of Assembly*, (2010)). Indeed, according to some courts and commentators, "[t]he Supreme Court has all but forgotten the right to assemble in the modern era." *Curtis v. Oliver*, No. CIV 20-0748 JB\JHR, 2020 WL 4734980 (D.N.M. Aug. 14, 2020). However, because the Supreme Court has, in the past, applied the free-speech time, place, and manner test to freedom of assembly claims—and because it has described expressive association as a right to engage in speech, worship, and assembly as a group, *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 617 (1984), thus suggesting that expressive association and assembly are distinct rights and not interchangeable—the Court addresses Plaintiffs' freedom of assembly and freedom of association claims separately in this case. Moreover, under either approach, the result is the same.

matter to justify abridgment, and the scope of the abridgment itself must not be greater than reasonably necessary to serve the state interest.").

Here, the Directives were content-neutral, applying to all private schools regardless of their religious identity. *Cf. W.D. v. Rockland Cty.*, No. 19 CIV. 2066 (JCM), 2021 WL 707065, at *34 (S.D.N.Y. Feb. 22, 2021) ("Here, the Declaration is content-neutral because it restricts the manner of assembly by gathering size, regardless of whether the purpose of gathering is secular or religious."). Moreover, Plaintiff concedes, ECF No. 20-1 at 31, and courts around the country have found, that the slow of the spread of COVID-19 is a significant and even compelling government interest. *See, e.g.*, *Murphy v. Lamont*, No. 3:20-CV-0694 (JCH), 2020 WL 4435167, at *13 (D. Conn. Aug. 3, 2020), *reconsideration denied*, No. 3:20-CV-0694 (JCH), 2020 WL 8082407 (D. Conn. Oct. 15, 2020). Finally, because the Directives were temporary in nature, lasting less than two months; left open ample alternate channels for communication—namely, virtual instruction; and the prevention of in-person transmission would have been less effectively achieved without the temporary closure of schools during a surge in cases, the Court finds that, even drawing inferences in Plaintiffs' favor, the Directives were narrowly tailored. *Cf. Tigges v. Northam*, 473 F. Supp. 3d 559, 572 (E.D. Va. 2020); *Givens v. Newsom*, No. 2:20-CV-00852-JAM-CKD, 2020 WL 2307224, at *6 (E.D. Cal. May 8, 2020) ("Admittedly, a blanket ban on the issuance of CHP [protest] permits for an unspecified period does not intuitively ring of narrow tailoring. But 'narrow' in the context of a public health crisis is necessarily wider than usual."); *Antietam*, 461 F. Supp. 3d at 236. Accordingly, Plaintiffs have failed to state a freedom of assembly claim.

### 3.  First Amendment: Freedom of Association

Plaintiffs also bring a freedom of association claim. The Supreme Court has "referred to constitutionally protected 'freedom of association' in two distinct senses": intimate association—the freedom to "maintain certain intimate human relationships"—and expressive association—the right to engage in a group effort to further other First Amendment-protected ends, such as speech, worship, or petition. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617, 622 (1984). At issue here is the latter. The Supreme Court "has made it clear that the right to expressive association is a derivative right, which has been implied from the First Amendment in order to assure that those rights expressly secured by that amendment can be meaningfully exercised." *Salvation Army v. Dep't of Cmty. Affs. of State of N.J.*, 919 F.2d 183, 199 (3d Cir. 1990) (citing *NAACP v. Alabama*, 357 U.S. 449, 460–61 (1958); *Roberts*, 468 U.S. at 618).

Importantly, "[t]he right to associate for expressive purposes is not, however, absolute." *Roberts*, 468 U.S. at 623. "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*[14] Accordingly, "[t]he primary difference between the time, place, manner test and the expressive-association test in *Roberts v. United States Jaycees* is that the latter framework requires that the government articulate a 'compelling' interest for restricting the freedom of expressive association." *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1053 (D.N.M. 2020) (citing 468 U.S. at 623).[15]

---

[14] *But cf. Salvation Army,* 919 F.2d at 199 ("The Court has not yet defined the parameters of the right to associate for religious purposes . . . . [I]t is apparent that the right to free speech has different contours than the right to free exercise of religion, and, accordingly, the right of expressive association has different contours depending upon the activity in which a group is engaged.").

[15] *See also Legacy Church,* 472 F. Supp. 3d at 1056 ("Although laws regulating expressive association must serve a compelling government interest, the Court concludes that the expressive-association framework in *Roberts v. United*

Having already determined that Plaintiffs have not sufficiently alleged that the Directives failed

the time, place, manner test, and additionally that preventing the transmission of COVID-19

through in-person interactions is a compelling government interest, the Court concludes that

Plaintiffs have also failed to allege that the Directives unlawfully infringed on their expressive

association rights. Accordingly, Plaintiffs' freedom of association claim is dismissed. *See*

*Antietam*, 461 F. Supp. 3d at 236 n.32 (similarly finding that, whether the claims at issue in that

case, related to a prohibition on gatherings, were analyzed under the freedom of assembly or

freedom of association framework, "the result would be the same," as the prohibition was

content-neutral, narrowly tailored, and furthered a compelling interest of slowing the spread of

COVID-19).[16]

### 4.  Fourteenth Amendment: Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires that no state "deny

to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §

1. This command "direct[s] that all persons similarly situated should be treated alike." *City of*

*Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *see also Giarratano v.*

*Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Thus, "[t]o state an equal protection claim, a

plaintiff must demonstrate that he has been treated differently from others similarly situated and

that the unequal treatment was the result of purposeful discrimination." *Antietam Battlefield*

---

*States Jaycees* and the time, place, and manner test entail the same degree of tailoring between a restriction and its purported purpose.").

[16] This conclusion comports with the Third Circuit's finding in *Salvation Army v. Department of Community Affairs of State of New Jersey*, that "[w]e would not expect a derivative right to receive greater protection than the right from which it was derived. In the context of the right to exercise of one's religious convictions, we think it would be particularly anomalous if corporate exercise received greater protection than individual exercise—if, for example, the right to congregational prayer received greater protection than the right to private prayer." 919 F.2d at 199. Here, the Court has found Plaintiffs' free exercise rights were not violated. Accordingly, the Court would not expect to find that Plaintiffs' associational free exercise rights have been violated.

*KOA v. Hogan*, 501 F. Supp. 3d 339, 346 (D. Md. 2020) (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)); *see also Klinger v. Dep't of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994) ("Dissimilar treatment of dissimilarly situated persons does not violate equal protection. . . . Thus, the first step in an equal protection case is determining whether the plaintiff has demonstrated that [he] was treated differently than others who were similarly situated to [him].").

Plaintiffs have not adequately alleged that private schools were treated unfavorably compared to public schools. As is clear in the Amended Complaint, public schools were closed for in-person learning through the fall semester—through January 2021. ECF No. 11 ¶ 55. The Directives closed private schools through October 1, 2020. *Id.* ¶ 16. Thus, while public and private schools were treated differently with respect to virtual learning requirements, public schools, not private schools, were the ones disproportionately burdened. *Cf. Peterson v. Kunkel*, 492 F. Supp. 3d 1183, 1196 (D.N.M. 2020) ("In essence, Plaintiffs are not seeking the standard for public and charter schools be applied equally to K.P. and her private school. Instead, Plaintiffs seek favorable treatment, a request that runs counter to the Equal Protection Clause." (citing *Fogle v. Pierson*, 435 F.3d 1252, 1260 (10th Cir. 2006)). To the extent Plaintiffs argue that, because the Directives did not cover public schools as well, the County's School Superintendent retained the authority to reverse course and open public schools in the fall—thus possibly creating a situation in which public schools were open while private schools remained closed—that assertion was speculative and, in the end, did not happen. To the contrary, throughout the fall semester, public schools were closed while private schools were allowed to remain open.

If Plaintiffs are understood to instead be arguing that the authority itself was the difference between private and public schools—in other words, that the harm was not the closure of in-person learning at private schools, but the fact that individual private schools no longer had the authority to choose whether to close or remain open, while the Superintendent, in theory, could have reopened schools at any time—Plaintiffs still fail to state a claim. First, it is not clear that the Superintendent is similarly situated to an independent school's legal authority with respect to their decisionmaking power. As Plaintiffs emphasize throughout the Amended Complaint, public and private schools have distinct governance structures. For example, Superintendent Smith's authority is limited, as his decisions are "ultimately subject to the visitorial power of the State Board of Education, which acts through the State Superintendent of Schools." ECF No. 11 ¶ 39. The legal authorities of Montgomery County's private schools are not similarly constrained. In other respects, however, Superintendent Smith has far greater power, as his decisions affect the entire network of public schools across Montgomery County. From that perspective, the authority of private schools' legal authority is more analogous to that of the leadership of an individual public school. Despite these differences, Plaintiffs claim asks the Court to compare apples and oranges.

Second, even if the court considered the difference in authority between the Superintendent and nonpublic schools' legal authorities to constitute unequal treatment of similarly situated entities, Plaintiffs' claim would fail. "In evaluating an equal protection challenge to a rule, courts must first determine the standard of review to apply. If the rule neither infringes a fundamental right nor disadvantages a suspect class, courts apply rational basis review." *Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Lynch*, 826 F.3d 191, 196 (4th Cir. 2016) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Private schools

are not a suspect or quasi-suspect class. *Cf. Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 537 (E.D.N.C. 2020) (listing cases in which race, national origin, alienage, gender, and illegitimacy are found to be suspect or quasi-suspect classes). Additionally, the Supreme Court has held that, at least for purposes of an equal protection claim, education is not a fundamental right. *Plyler v. Doe*, 457 U.S. 202, 223 (1982) ("[A] State need not justify by compelling necessity every variation in the manner in which education is provided to its population."). Therefore, rational basis review applies to Plaintiffs' equal protection claim.

As stated above, under that standard, the law "is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Smith Setzer & Sons, Inc. v. S.C. Procurement Rev. Panel*, 20 F.3d 1311, 1320 (4th Cir. 1994) (quoting *City of Cleburne,* 473 U.S. at 440). Furthermore, "those attacking the rationality of the [rule] have the burden to negative every conceivable basis which might support it." *Lynch*, 826 F.3d at 196 (alteration in original) (quoting *Beach Commc'ns*, 508 U.S. at 314–15). "In other words, where there are plausible reasons for the rule, the court's inquiry is at an end." *Id.* (cleaned up) (quoting *Beach Commc'ns*, 508 U.S. at 313–14).

Here, even drawing all inferences in Plaintiffs' favor, the Court concludes that Defendants had a rational basis for the Directives and for limiting them to private schools. Put simply, the Directives furthered the state interest of reducing COVID-19 transmission through in-person interaction, and they were limited to private schools because public schools had already been closed for the semester based on the advice of Dr. Gayles, and there was no indication that Superintendent Smith would reopen them prior to October 1, 2020.[17] Given this

---

[17] Superintendent Smith's statement on August 6, 2020, that if circumstances changed dramatically in the early fall, the public school system "might be able to accelerate" reopening prior to February, is not to the contrary. ECF No. 11 ¶ 79.

rational explanation, the Court need not delve further into the County's decisionmaking. *Cf. Belle Garden Est., LLC v. Northam*, No. 7:21CV00135, 2021 WL 1156855, at *7 (W.D. Va. Mar. 26, 2021) ("This common-sense justification is sufficient to demonstrate that Order 72 is likely rationally related to a legitimate state interest of controlling the spread of a deadly and contagious virus among its citizenry."). Plaintiffs' equal protection claim is dismissed.

* * *

When this case was initially filed, and emergency relief was sought, the primary question posed to the Court was whether Dr. Gayles had exceeded his authority in issuing the Directives forbidding private and religious schools from having in-person instruction. That issue was mooted when Dr. Gayles rescinded the Directives, leaving only the constitutional claims brought under § 1983. Having determined that Plaintiffs failed to adequately allege that the Directives violated their First and Fourteenth Amendment rights, the Court concludes that those claims fail. Accordingly, the Amended Complaint is dismissed.

## IV.   CONCLUSION

For the foregoing reasons, the Motions to Dismiss filed by Defendants County and Elrich, ECF Nos. 14 & 16, and by Defendant Gayles, ECF No. 15, are granted. A separate Order follows.

Date: <u>July 26, 2021</u>                    _/s/_____
                                             GEORGE J. HAZEL
                                             United States District Judge